**In re SPECO CORPORATION,**
Debtor in Possession.

**Bankruptcy No. 95–34619.**

United States Bankruptcy Court,
S.D. Ohio,
Western Division.

April 26, 1996.

John C. Hartranft, Jack R. Pigman, Teri G. Rasmussen, Porter, Wright, Morris & Arthur, Columbus, Ohio, for SPECO Corporation, Debtor and Debtor-in-Possession.

Frederick G. Cloppert, Jr., Cloppert, Portman, Sauter, Latanick & Foley, Columbus, Ohio, for UAW and UAW Local 1192.

John E. Hoffman, Jr., Arter & Hadden, Columbus, Ohio, for the Official Committee of Creditors.

Daniel W. Sherrick, International Union, UAW, Detroit, MI.

Mark McDonald, Baker & McKenzie, Dallas, TX.

Denise Tataryn, Pension Benefit Guaranty Corp., Washington, DC.

Stephen D. Lerner, Taft, Stettinius & Hollister, Cincinnati, Ohio.

Linda M. Battisti, Asst. U.S. Trustee, Columbus, Ohio.

## OPINION ON ORDER ISSUED MARCH 21, 1996

WILLIAM A. CLARK, Chief Judge.

On March 21, 1996, this court issued an order (Doc. # 127) denying SPECO Corporation's "Motion for Approval of Modification and Termination of Payment of Retiree Benefits." The following constitutes the court's opinion to support the court's earlier order.

### STATEMENT OF FACTS

Testimony at the hearing on the debtor's motion, as well as the undisputed portions of the parties' statements of facts in their memoranda of law, have established the following basic facts.

SPECO Corporation, the debtor in possession, manufacturers helicopter rotor transmissions, air craft and marine gear drive assemblies, aircraft flight control systems, and accessory gearboxes for military and commercial aircraft. In 1986, the debtor's sales peaked at $114 million and have decreased since that time. The company has undergone two changes in ownership since 1986, and a new management team was put in place in 1994 in order to restructure the company. Although the team was able to stabilize sales at approximately $15 million/year in 1994 and 1995, it has been unable to rid the company of operating losses (approximately $11 million in 1994 and an estimated $15 million in 1995).

During this period the debtor's cost of providing employee pension benefits and post retirement health benefits increased. Of importance to the motion before the court, the debtor's cost for retiree benefits in 1992 was approximately $500,000 per year, but has risen to almost one million. The following descriptive summary of the debtor's retiree benefits obligations is contained in the debtor's motion and does not appear to be contested by the respondents:

As part of the current collective bargaining agreement ("CBA") with the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, UAW, Local Union No. 1191 (the "Union") dated March 1, 1995, hourly employees of Debtor retiring subsequent to April 1987 are entitled to Retiree Benefits upon retirement pursuant to Insurance Supplement "F–1" to the CBA ("CBA Insurance Supplement").... Under the CBA Insurance Supplement, retirees and eligible dependents receive medical coverage through a private carrier, and Debtor pays the applicable premiums for such coverage.... In addition, retirees receive hearing aid benefits ... for which Debtor pays applicable group insurance premiums. Currently, approximately 240 retirees (about 420 individuals when spouses are included) and 18 surviving spouses receive Retiree Benefits from Debtor; approximately 40 of this total (about 70 individuals when spouses are included) and 4 surviving spouses are on Medicare. Approximately 70 additional individuals (and their spouses) will also be eligible participants when they retire. Salaried employees are not entitled to any health or medical benefits when they retire.

In March 1995, the current CBA was signed with the Union as part of an effort to return the Debtor to profitability and to reduce costs. In the area of Retiree Bene-

fits, this new contract introduced the following key provisions:

—All active bargaining unit employees would share the cost of the medical insurance, on the basis of 10% the first year, 15% the second year, and 20% the third year.... This sharing was applied to all active employees, including the (non-represented) salaried employees.

—The same cost sharing provision was applicable to retirees covered under private insurance. For retirees covered by Medicare, no contribution was required, but the coverage was reduced to Medigap Policy I.... Previously, Debtor also paid for a Medicare Part B type of coverage. In addition, Debtor's contributions were capped at 80% of calendar year 1997 premium expense for family coverage for private insurance, and $150.00 per policy for Medigap.... The combination of these cost saving measures reduced Debtor's actuarial estimate total liability from $25 million to $13.4 million.

—The CBA provided retirees with an opportunity to maintain a higher level of coverage starting in 1997 or when Debtor became profitable, if sooner. Under the CBA, once profitable, Debtor would be obligated to contribute a portion of its operating margin to a Trust Fund (to be established). The Trust Fund would be co-managed by Debtor, the bargaining unit, and representatives of the retirees....

—New employees, i.e., employees who are not active or on lay-offs as of March 1, 1996, are not eligible for either the defined benefit plan ... or retiree medical benefits.... Instead, they will be eligible for a defined contribution (401K) plan with a match by Debtor....

Despite Debtor's aggressive cost containment measure implemented under the CBA, Debtor's cost incurred in paying the applicable insurance premiums for the Retiree Benefits remains at almost $1 million annually, or more than $80,000 per month.... Debtor's expense is calculated based on the number of employees enrolled. Thus, this cost can be expected to continue to increase as a result of Debtor's aging work force and an unusually large number of retirements since Debtor filed its Chapter 11 bankruptcy proceeding; Debtor experienced 9 retirements in January 1996 and anticipates 7 retirements in February 1996. Indeed, actuarial present value estimates of the aggregate amount of this expense for payment of applicable premiums range from $13.4 million (on a going concern basis) to $13.9 million (assuming a complete plant shutdown), almost as much as Debtor's annual sales. In actuality, Debtor's costs for Retiree Benefits may even be greater. Debtor's insurance carrier is presently pooling insurance claim experience rates of Debtor's active and retiree medical populations, resulting in underestimation of the economic cost to Debtor of providing Retiree Benefits by as much as 10–15%.

Doc. # 107 at 6–9.

Debtor filed its petition for relief on December 22, 1995, under chapter 11 of the Bankruptcy Code.

On December 29, 1995, the debtor made a written proposal to the retirees' union to provide retiree benefits as part of an employee K/ESOP plan. Under that plan the debtor was to be converted from a wholly-owned subsidiary of LBG, Inc., into a company owned by its employees and management in roughly the following manner: union employees (40%), salaried employees (30%) and management (30%) (Exh. 11, p. 10). Under such plan, debtor's retirees were to receive lump sum distributions from their defined benefit plan and use these distributions (or a portion thereof) to purchase stock in the "new" SPECO. As part of the overall transaction, money would also be placed in a trust fund to pay for the retirees' future medical benefits.

After a series of meetings between the debtor's representatives and representatives for the Union, the Union rejected the debtor's proposal for financing retiree health benefits. Mr. Ron Rhine, an international representative for UAW, explained the reason for the Union's rejection as follows:

The proposal, what it amounts to is taking a defined benefit plan, which simply to explain it is X amount of dollars times years of service. Taking this plan and breaking it up and actually going into the possibility of lump sums, or using that money, part of that money, to pay for health care benefits and by doing that you completely destroy the life time benefit level that these people have worked so hard so many years for.

Tr. at 140.

It does not appear that the Union ever offered a concrete counter proposal to the debtor's original proposal, and on approximately February 13, 1996, the debtor submitted a second bargaining proposal to the Union in which it is stated that:

The costs for continued retiree medical insurance for current retirees and future retirees is a severe financial drain on the company and one of the most significant liabilities impeding the possibility of a successful sale. Therefore, the company proposes that its obligation to fund insurance premiums for retiree medical benefits be eliminated effective immediately and that the pertinent contract provisions be amended accordingly. Unfortunately, absent the funding through the K/ESOP approach, the Company is unable to provide the financial resources for continued retiree medical benefits.

Exh. # 12 at 3.

### CONCLUSIONS OF LAW

Prior to the enactment of § 1114 of the Bankruptcy Code, a debtor in possession was generally able, under § 365, to reject a contract to provide health benefits to its retirees. As a result of the 1986 bankruptcy filing of LTV Corporation, Congress sought to afford more protection to retirees:

In July of 1986, LTV filed a petition under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York. Almost immediately thereafter, LTV announced that it would no longer pay health benefits to its approximately 78,000 retirees and their dependents. LTV's affected retirees consisted of both former salaried employees who received benefits under programs terminable at will and former union employees whose benefits were governed by collective bargaining agreements.

Congress acted immediately to address LTV's action. On July 28, 1986, the Senate Judiciary Committee held a hearing addressing the cutoff of retiree benefits and two days later the Senate passed a bill ordering LTV to reinstate benefits. The House of Representatives commenced hearings the following week, which resulted in the passage of a bill protecting union retiree benefits by explicitly including such benefits within the protection of section 1113 of the Bankruptcy Code. At the same time as the Senate action, and in response to a steelworkers' strike at several of its profitable plants, LTV sought and obtained authorization from the bankruptcy court to continue paying retiree benefits.

Neither the original Senate nor the original House bill was enacted. Instead, Congress passed much broader stopgap legislation to give itself time to deal more thoroughly with the issue. The provision was made applicable to pending Chapter 11 cases, such as that of LTV. On June 16, 1988, after twice extending its stopgap legislation, Congress passed [The Retiree Benefits Bankruptcy Protection Act of 1988], which has been codified as § 1114 of the Bankruptcy Code.

Susan J. Stabile, *Protecting Retiree Medical Benefits in Bankruptcy: The Scope of Section 1114 of the Bankruptcy Code,* 14 Cardozo L.Rev. 1911, 1926–1927 (1993) (footnotes omitted).[1]

1. As part of the Retiree Benefits Bankruptcy Protection Act of 1988, Congress also enacted § 1129(a)(13) of the Bankruptcy Code which provides that:
(a) The court shall confirm a plan only if all of the following requirements are met:
   . . . .

(13) The plan provides for the continuation after its effective date of payment of all retiree benefits, as that term is defined in section 1114 of this title, at the level established pursuant to subsection (e)(1)(B) of (g) of section 1114 of this title, at any time prior to confirmation of the

Although the precise congressional intent in enacting § 1114 may be difficult to glean,[2] the language of the statute makes it quite clear that—absent the occurrence of two statutory conditions—the debtor in possession is required to continue the payment of retirement benefits at prepetition levels:

(e)(1) *Notwithstanding any other provision of this title*, the debtor in possession, or the trustee if one has been appointed under the provisions of this chapter (hereinafter in this section "trustee" shall include a debtor in possession), *shall* timely pay and *shall not* modify any retiree benefits, except that—

(A) the court, on motion of the trustee or authorized representative, and after notice and a hearing, may order modification of such payments, pursuant to the provisions of subsections (g) and (h) of this section; or

(B) the trustee and the authorized representative of the recipients of those benefits may agree to modification of such payments;

after which such benefits as modified shall continue to be paid by the trustee.

11 U.S.C. § 1114(e)(1) (emphasis supplied).

The statute contains no other basis for debtors to modify or cease the payment of retiree benefits.

If a debtor in possession has decided to attempt the modification of benefit payments it is otherwise required to make to its retirees, there are several conditions a debtor in possession must fulfill *before* it may make an application to the court to modify those benefits:

(f)(1) Subsequent to filing a petition and *prior* to filing an application seeking modification of the retiree benefits, the trustee *shall*—

(A) make a proposal to the authorized representative of the retirees, based on the most complete and reliable information available at the time of such proposal, which provides for those necessary modifications in the retiree benefits that are necessary to permit the reorganization of the debtor and assures that all creditors, the debtor and all of the affected parties are treated fairly and equitably; and

(B) provide, subject to subsection (k)(3), the representative of the retirees with such relevant information as is necessary to evaluate the proposal.

(2) During the period beginning on the date of the making of a proposal provided for in paragraph (1), and ending on the date of the hearing provided for in subsection (k)(1), the trustee shall meet, at reasonable times, with the authorized representative to confer in good faith in attempting to reach mutually satisfactory modifications of such retiree benefits.

11 U.S.C. § 1114(f).

■ Once a debtor in possession has met the conditions of § 1113(f)(1), it may then file an application for modification, and the court will hold a hearing to determine whether a modification should be ordered. 11 U.S.C. § 1114(g), (k). Under § 1114(g),[3] however, the first question before the court in considering the question of modification is whether the debtor in possession has fulfilled the conditions of § 1114(f)(1) of the Bankruptcy Code. It is this court's opinion that in the

plan, for the duration of the period the debtor has obligated itself to provide such benefits.

**2.** *See, e.g.,* H.R.Rep. No. 2969, 100th Cong., 2d. Sess. (1988).

**3.** (g) The court shall enter an order providing for modification in the payment of retiree benefits if the court finds that—

(1) the trustee has, prior to the hearing, made a proposal that fulfills the requirements of subsection (f);

(2) the authorized representative of the retirees has refused to accept such proposal without good cause; and

(3) such modification is necessary to permit the reorganization of the debtor and assures that all creditors, the debtor, and all of the affected parties are treated fairly and equitably, and is clearly favored by the balance of the equities;

except that in no case shall the court enter an order providing for such modification which provides for a modification to a level lower than that proposed by the trustee in the proposal found by the court to have complied with the requirements of this subsection and subsection (f)....

11 U.S.C. § 1114(g).

instant case the debtor in possession has not met its burden of proof to demonstrate that it has complied with § 1114(f)(1). The court is satisfied that complete and reliable information has been supplied to the retirees' authorized representative. The court is not convinced, however, that the debtor in possession's proposal to pay none of the retirees' health benefits constitutes modifications "that are necessary to permit the reorganization of the debtor." The reason that the debtor in possession has been unable to demonstrate to the court that its proposed modification is necessary to permit its reorganization is that the debtor in possession has not yet determined whether it will be proceeding as a going concern or electing to liquidate its assets. The debtor has argued that it is too early in the administration of this case for it to make such a determination, and it is not yet required to submit a plan of reorganization. While this may be true, it is equally true that nothing in § 1114 appears to contemplate that a company's retiree's should give up their retiree benefits while the company decides whether to reorganize or liquidate. In short, if the debtor in possession will not inform the court, at least in general terms, of its future plans, it is by definition impossible for the court to determine whether a proposed modification of retiree benefits is *"necessary"* to permit a debtor's reorganization.[4] Nor does the court believe it appropriate to require the retirees to pay for the debtor's privilege of remaining in a "holding pattern" with respect to its decision to liquidate its assets or to proceed with a reorganization.

■ For similar reasons, the court finds it impossible to gauge whether the debtor in possession's proposed modification "assures that all creditors, the debtor and all of the affected parties are treated fairly and equitably." The court knows that the debtor wishes to pay nothing in the way of retiree health benefits but has been told little concerning what the debtor proposes to pay other creditors. Without knowing how other creditors, besides the retirees, are to be treated by the debtor, the court simply cannot make a determination regarding fair and equitable treatment. Again, the debtor has a right to withhold its decisions regarding the proposed treatment of creditors, but nothing in § 1114 suggests to the court that retirees should give up their benefits while the debtor makes its financial decisions. To hold otherwise would, in this court's opinion, severely diminish the protection Congress has afforded retirees.

■ At this point, then, having found that § 1114(g)(1) has not been satisfied, the court's inquiry must end. In the interest of judicial economy, the court will point out that even if § 1114(g)(1) had been satisfied by the debtor, § 1114(g)(2) has not. The debtor in possession did not demonstrate that "the authorized representatives of the retirees has refused to accept such proposal without good cause" as required by 11 U.S.C. § 1114(g)(2). The debtor in possession's *latest* proposed modification, and the one currently before the court, is for the debtor in possession's retirees to surrender their § 1114 statutory rights to health benefits in exchange for absolutely nothing. (The debtor in possession's contention that the retirees would be given an unsecured claim in exchange for their surrendering their rights is unpersuasive.) The court cannot conceive, at this time, of arriving at a decision that the retirees' refusal to accept nothing in exchange for their rights constitutes a lack of good cause. The latest proposal constitutes nothing more than an attempt to unilaterally terminate the retirees benefits and is precisely what § 1114 was intended to prevent.

---

4. Because of the debtor's failure to inform the court of the preliminary contours of its plan of reorganization, it is unnecessary for the court to determine the appropriate approach to defining "necessary to the reorganization of the debtor." Compare, e.g., the approaches of the courts in interpreting the analogous language of 11 U.S.C. § 1113 in the cases of *Wheeling–Pittsburgh Steel Corp. v. United Steelworkers,* 791 F.2d 1074 (3rd Cir.1986) and *Truck Drivers Local 807 v. Carey Transp., Inc.,* 816 F.2d 82 (2d Cir.1987).