294 B.R. 903 (2003)
In re FARMLAND INDUSTRIES, INC., et al., Debtor.
No. 02-50557-JWV.
United States Bankruptcy Court, W.D. Missouri.
May 28, 2003.

*904 *905 MEMORANDUM OPINION AND ORDER

JERRY W. VENTERS, Bankruptcy Judge.
Farmland Industries, Inc., and its affiliated debtors in these Chapter 11 proceedings *906 have asked the Court to give its blessing to the termination of numerous retiree benefit programs and employment agreements. The requests raise an issue of first impression for the Court  whether a Chapter 11 debtor's proposed termination of retiree benefits must comply with the procedures and requirements of 11 U.S.C. § 1114 when the debtor has an absolute right under the pre-bankruptcy plan documents to unilaterally terminate those benefits.
There are two motions before the Court. The first is the Debtors' Motion for Order Authorizing the Termination of Certain Retiree Benefits Under Group Term Life Insurance Policy with Minnesota Life Insurance Company (Document # 1688) (the "Retiree Benefits Motion"). The second is the Debtors' Motion for Order Authorizing (I) the Termination of Certain Executive and Director Benefits and (II) Rejection of Certain Executory Employment Agreements (Document # 1689) (the "Executive Benefits Motion"). Both Motions were filed on December 11, 2002. The Court conducted a hearing on both Motions on January 28, 2003, at the United States Courthouse in Kansas City, Missouri, and took the Retiree Benefits Motion under advisement at that time. Because of a scheduling conflict for counsel, the Court held a continued hearing on February 11, 2003, on the Objections of twelve retired executives[1] to the Executive Benefits Motion and then took that Motion under advisement as well. The Court has reviewed the pleadings and relevant case law, has considered the evidence adduced at the hearings and the arguments of counsel, and is now ready to rule.[2]
For the reasons set out below, the Court will deny the Debtors' Retiree Benefits Motion(Document # 1688) in its entirety for the Debtors' failure to comply with 11 U.S.C. § 1114. The Court will deny that portion of the Executive Benefits Motion (Document # 1689) that requests approval for the termination of retiree benefits as defined in 11 U.S.C. § 1114(a), and will grant that portion of the Executive Benefits Motion that proposes to terminate the retirement benefits for various current and former executives and directors. The Court will also grant the Debtors' request, included in the Executive Benefits Motion, to reject the employment agreements of four former executives.

FACTUAL FINDINGS AND BACKGROUND[3]
A. Retiree Benefits Motion
In the Retiree Benefits Motion, the Debtors[4] seek Court approval to terminate *907 certain life insurance benefits provided for their retired employees under a group term life insurance policy with Minnesota Life Insurance Company ("Minnesota Life"). The life insurance program was started in 1977. The Minnesota Life policy has been in effect only since October 1, 2001; prior to that time, the life insurance coverage had been provided under a policy issued by American United Life Insurance Company. The policy provides life insurance for approximately 2,200 former or retired employees ("Retirees"), as well as an unstated number of currently active employees. The employees are divided into six classes under the policy, but the Debtors do not seek to terminate life insurance coverage for all six classes of employees. They seek only to terminate the life insurance benefits for current Retirees and, prospectively, the obligation to provide life insurance for active employees as they retire in future years.[5] The amount of life insurance coverage for the active employees and the Retirees varies in each class. Most of the Retirees have coverage in excess of $10,000, and some have up to $50,000 of coverage. The monthly cost of premiums to the Debtors is approximately $63,000.00, or $756,000.00 a year. This cost will increase as active employees with the insurance coverage retire and become eligible for additional life insurance benefits. Farmland provides the benefits at no cost to the Retirees; the Retirees have never contributed to the life insurance program. (McCoy Affidavit, ¶ 18)
Farmland retained the right to unilaterally terminate or amend the life insurance program without the consent of the Retirees. (McCoy Affidavit, ¶ 11; Debtors' Ex. 33, p. 2; Debtors' Ex. 34, p. 21) This is not the first time Farmland has altered or restricted the life insurance program. In 1988, Farmland limited the group of people eligible for life insurance to those who were already employed by Farmland. In 2001, Farmland altered the program to further restrict eligibility in the program. (McCoy Affidavit, ¶ 16) As the policyholder, Farmland has the ability to terminate the insurance policy with Minnesota Life at any time, upon 31 days' written notice to Minnesota Life. (Debtors' Ex. 32, p. 10) Although it seeks to terminate the group insurance policy, Farmland has arranged with Minnesota Life for the Retirees to obtain alternative life insurance coverage at their own expense if the Retiree Benefits Motion is granted; however, the objecting Retirees contend that this option is not viable because the cost of the replacement life insurance is prohibitive. For example, Calvin Elliott, one of the objecting Retirees, stated to the Court that it would cost him $970.00 a year for $10,000 of insurance coverage, the maximum he would be permitted to obtain under the program.[6]
The Official Committee of Unsecured Creditors and the Bondholders Committee both supported the termination of benefits *908 as proposed in the Retiree Benefits Motion.
B. Executive Benefits Motion
In the second Motion before the Court, the Executive Benefits Motion, the Debtors seek to terminate several programs or plans providing a variety of benefits for certain current and former executive employees (the "Executives") and members of the Farmland Board of Directors (the "Board"). The programs that this Motion seeks to terminate are the Farmland Industries, Inc. Executive Deferred Compensation Plan (the "Deferred Comp Plan"); the Farmland Industries, Inc. Supplemental Executive Retirement Plan (the "SERP"); the Union Equity Deferred Compensation Plan (the "Union Equity Plan"); life insurance provided to current and former members of the Board (the "Director Life Plan"); supplemental life insurance benefits to members of the Board (the "Supplemental Life Plan"); a deferred compensation plan for the Board (the "Director Deferred Comp Plan"); and life insurance benefits under a split-dollar life insurance arrangement offered to certain Executives (the "Executive Life Plan").[7]
It is uncontested that the Executive Benefits Plans expressly give Farmland the right to terminate or modify the various programs and benefits. Farmland states that termination of the Executive Benefits Plans will provide over $16 million to the bankruptcy estate, primarily as a result of the cancellation of life insurance policies that were purchased to help Farmland fund the various programs and benefits. The cash surrender values payable to Farmland on the various insurance policies can be summarized as follows:

 Executive Life Plan $4,150,000.00
 SERP 4,100,000.00
 Union Equity Plan 5,600,000.00
 Director Life Plan &
 Supplemental Life Plan 2,599,000.00

1. Executive Deferred Compensation Plan
Under the Deferred Comp Plan, certain executives of the Debtors were allowed to defer portions of their salaries until a later date (specified by the Executives) so as to gain certain tax benefits. Approximately 138 current and former employees of the Debtors participate in the Deferred Comp Plan. In addition to their deferred compensation, the Executives are entitled to receive an additional distribution, called a Retirement Adjustment Payment, to replace the loss in retirement benefits that occurs because of the salary deferral.[8] Section 11 of the Deferred Comp Plan (Debtors' Ex. 22) authorizes the Farmland Board, in its absolute discretion, to suspend, amend, modify, or terminate the Plan at any time, without notice to the participating Executives.
Farmland states that the Debtors' liabilities to the Executives participating in the Deferred Comp Plan are about $14.4 million for deferred compensation and $2.5 million in Retirement Adjustment Payments. All of these amounts were incurred prior to the Petition Date and are unfunded. According to the Motion, the Board of Directors of Farmland suspended the Deferred Comp Plan as of May 30, 2002, immediately prior to the filing of the Chapter 11 bankruptcy.
*909 2. Supplemental Executive Retirement Plan
The SERP, according to the Motion, is a non-qualified benefit plan designed to supplement pension payments for Executives who are affected by the limitations contained in Sections 401(a)(17) and 415 of the Internal Revenue Code relating to pension calculations. Under this plan, the Debtors have agreed to replace all or a portion of the employer-provided pension benefits lost by the Executives as a result of those limitations. Fifty-two current and former employees of the Debtors were receiving payments under the SERP as of the Petition Date. The Debtors ceased making payments under the SERP as of the Petition Date and have made no payments with respect to the SERP since the bankruptcy filing.
The Debtors state that the current amount of liabilities payable to participants in the SERP is about $9 million, and that, pursuant to Section 9 of the SERP, all amounts due to participants are general unsecured claims. However, the Debtors maintain a number of life insurance policies that, while not directly related to the SERP, are intended to assist the Debtors in satisfying the liabilities associated with the SERP. The Debtors contend that the insurance policies, which have a cash surrender value of about $4.1 million, are property of the bankruptcy estate, and they seek to surrender the policies so as to realize their cash values for the Debtors' estates.
3. Union Equity Plan
The Union Equity Plan is an informal name given to several agreements entered into by the Debtors and certain employees who worked for Union Equity Cooperative Exchange when it was acquired by Farmland in 1992. Under this plan, the Debtors agreed to pay the affected employees specified sums in installments over 10 years after the employees' retirements. The Debtors have agreements with 11 former employees (nine of whom were receiving payments prior to the Petition Date) and one current employee. The Debtors assert that all obligations under the Union Equity Plan are general unsecured claims. As a means of helping fund these obligations, the Debtors purchased several life insurance policies, which now have a cash surrender value of about $5.9 million. As with the other life insurance policies, the Debtors assert that the insurance policies are property of the estate and that the participants in the Union Equity Plan do not have any claim or interest in the policies.
The Debtors contend that the agreements between Farmland and the Union Equity Plan participants are not executory contracts, but are simply "promises to make payments at specified times." To the extent that the Court should determine that the agreements constitute executory contracts, the Debtors ask that they be allowed to reject the contracts pursuant to 11 U.S.C. § 365. Terminating the Union Equity Plan would not subject the Debtors to any additional liabilities.
4. Director Life Insurance Plan
Under the Director Life Plan, the Debtors provide each member of the Farmland Board of Directors with a life insurance policy in the face amount of $100,000. Upon a member's retirement, the policy is reduced to $50,000. Currently, the Debtors provide life insurance to 20 active Board members and 28 retired Board members, at an annual cost of $246,739.51. In connection with this Plan, the Debtors have entered into Split Dollar Agreements with the directors, which provide that the Debtors are the owners of the insurance policies and require that the Debtors pay *910 the premiums thereon, and the individual directors designate the beneficiaries of the policies. The Split Dollar Agreements entered into with individuals who became members of the Board prior to 1999 are slightly different than those executed in 1999 and thereafter. The pre-1999 Split Dollar Agreements allow the Debtors to terminate the arrangement at any time and to discontinue the life insurance without the Board member's consent, although the Debtors must provide the members with notice of termination of the program. The Split Dollar Agreements entered into in 1999 and thereafter prevent the Debtors from terminating an individual's life insurance after the individual has completed his or her term on the Board or has retired or become disabled. Additionally, the director would have the option to buy out the applicable policy for the lesser of (i) the Debtors' interest in the policy or (ii) the cash surrender value of the policy.
The Debtors assert that those current and retired Board members who are subject to the pre-1999 Split Dollar Agreements would have no claim against the Debtors because the Debtors have the right to cancel the life insurance benefits unilaterally, at any time and without the member's consent. As for those members who are covered by Split Dollar Agreements entered into in 1999 and thereafter, their life insurance benefits have vested and those individuals would possibly have a claim against Farmland with respect to those benefits, the Debtors state.
Under the agreements, the current and former Board members have the right to purchase their life insurance policies from the Debtors. Because some of the individuals affected might not be able to obtain other life insurance coverage, Farmland intends to give the members the option to purchase their insurance policies so as to continue the coverage at their own cost. The Debtors would, however, be permitted to realize the cash surrender value of the policies. In addition to saving over $246,000 a year in insurance premiums, the Debtors would realize about $2.4 million in proceeds from surrender of the policies.
5. Supplemental Director Life Insurance Plan
In addition to the regular Director Life Plan, the Debtors maintain a program to provide supplemental life insurance benefits to Board members who are elected to the Board for a second term. This Plan provides each eligible Board member with an additional $100,000 in life insurance coverage. Presently, 16 active Board members and five retired Board members participate in the Supplemental Life Plan. As with the Director Life Plan, Farmland has entered into Split Dollar Agreements with the Board members participating in the Plan. Participating members are the owners of their individual insurance policies, but they are required to collaterally assign the policies to Farmland during their terms on the Board. Farmland is obligated to pay the cost of the premiums on each individual's policy for the longer of 10 years or the length of time the individual serves on the Board after election to a second term. After an individual retires, Farmland pays the insurance premiums indirectly by making the amount of the premium payment to the individual under a Director Compensation Continuation Plan, and the individual in turn pays the required premium to the insurance company. The Director Compensation Continuation Plan would be unnecessary if the Supplemental Life Plan is terminated.
Terminating the Supplemental Life Plan would save the Debtors about $50,000 a year in insurance premiums. Farmland would also be positioned to recover from the participants approximately $75,000 in *911 premiums paid on their behalf, pursuant to the Split Dollar Agreements.
6. Director Deferred Compensation Plan
The Director Deferred Comp Plan is similar to the Executive Deferred Comp Plan for the Executives. It allows Board members to defer their compensation in much the same way the Executives are permitted to defer their compensation. Only four Board members have participated in this program. Farmland has current liabilities of approximately $109,000 to the directors, and has not set aside any funds to cover these liabilities. The documents establishing the Plan allow Farmland to discontinue the program at any time. Terminating the Plan will limit further liabilities under the Plan.
7. Executive Split Dollar Life Insurance Plan
Under the Executive Life Plan, the Debtors and the Executives share the costs of premiums for the Executives' life insurance coverage. Participating active Executives receive life insurance equal to two-and-one-half times their annual compensation; this amount is reduced by one-half upon retirement. Seventeen active employees and 60 retired employees participate in the Executive Life Plan. The Executives receive the life insurance coverage pursuant to individual Split Dollar Agreements with Farmland. There are two different Split Dollar Agreements involved in the Executive Life Plan. Both forms of Agreement authorize Farmland to terminate the Agreement, subject to the right of the employee to purchase the life insurance policy providing coverage for the employee. The Split Dollar Agreements executed in 1997 and thereafter provide that the Executive's benefit fully vests upon the Executive's attainment of retirement eligibility, whereas those Agreements executed prior to 1997 contain no such provision. Therefore, the Debtors believe that the benefits provided under the 1997 and later Split Dollar Agreements are "retiree benefits" within the meaning of 11 U.S.C. § 1114 and they do not seek to terminate those benefits. However, the Debtors do seek to terminate the benefits provided to those Executives with Split Dollar Agreements entered into prior to 1997.
Although they have offered no evidence of the savings that might be realized by terminating just the Executive Life Plan, the Debtors state that the benefits received do not justify its continuation.[9] The Debtors would receive approximately $4.1 million from the surrender of the life insurance policies under this Plan.
The termination of the Executive Life Plan was objected to by twelve retired Farmland executives (the "Retired Executives"), who asserted that they were, in large part, induced to retire by Farmland's promise that the life insurance policies would be kept in force. Jack Warren, one of the Retired Executives, believed that his right to the insurance coverage had vested prior to his retirement, based on a document he received from Farmland in 1990 stating that vesting in the Split Dollar Life Insurance program would occur after 10 years with the company and upon reaching the age of 55. (Retired Executives' Ex. 102) Warren also believed that, upon his retirement, his life insurance would be paid up for the rest of his life, based on another document he received in 1990. (Retired Executives' Ex. 103) However, *912 Warren acknowledged on cross examination that he had received and signed a new agreement in 1993 that gave Farmland the right to terminate the life insurance. Warren testified that many of the Retired Executives made retirement decisions based on having the insurance coverage in effect for the rest of their lives.
At the hearing on February 11, counsel for the Retired Executives argued that the proposed termination of the split-dollar life insurance policy should be denied because Farmland had failed to meet its burden under § 1114(g)(3) of the Bankruptcy Code. Counsel further argued that Farmland's decision to terminate these life insurance policies was bad business judgment because it was his belief that the Debtors would receive more cash if they waited until the death benefits were paid on the policies rather than taking the cash surrender values currently available. A summary report of the Retired Executives' benefits showed that Farmland would receive $2,619,325 in cash upon termination of their life insurance coverage. (Rainey Ex. 101)
C. Termination of Employment Agreements
In addition to requesting Court approval to terminate all of the Plans set out above, the Debtors also seek to reject four employment agreements that the Debtors contend are executory contracts. These are the employment agreements (the "Employment Agreements") of the former president and chief executive officer of Farmland, Robert W. Honse ("Honse"); the former chief financial officer of Farmland, John F. Berardi ("Berardi"); the former president of Farmland Foods, Inc., William Fielding ("Fielding"); and another former president and chief executive officer of Farmland, H.D. Cleberg ("Cleberg") (collectively, the "Former Officers"). Under the terms of the Employment Agreements, the Debtors remain obligated to pay severance and other benefits to the Former Officers and  in return  the Former Officers are obligated to provide consulting services as needed, cooperate with the Debtors, and refrain from competition or interference with the Debtors' businesses. The Debtors' costs under these Employment Agreements exceed $120,000.00 per month. Under the agreement with Cleberg, the Debtors are obligated to make two remaining payments of $450,000.00 each.
Honse objected to the Debtors' Motion on grounds that his Employment Agreement was not an executory contract, because Honse had no remaining material obligations under his Employment Agreement. Although counsel for Honse presented this argument at the hearing on January 28, he did not adduce any evidence in support of the argument.
Fielding filed a qualified objection to the Motion, arguing that his termination by Farmland was "without cause" as defined in his Employment Agreement, and stating that he is entitled to liquidated damages equal to two years' base salary and various other payments. He requested additional time to file an amended Proof of Claim to present these claims. By stipulation with the Debtors (Document # 1960), Fielding was permitted to file an amended Proof of Claim to include all of his claims with respect to the Employment Agreement. Therefore, Fielding's objection is deemed withdrawn.
Calvin Elliott, one of the Retirees covered by the SERP, filed an objection stating that Farmland employees understood that, once payments had commenced under the SERP, that was an irrevocable benefit and that provisions of the Plan allowing for unilateral termination by Farmland only applied to those employees *913 who had not yet elected to retire in partial reliance on the Plan. If a covered employee had not retired, he or she would be able to adjust retirement plans with the knowledge that the supplemental retirement benefits would not be available upon one's retirement. This understanding was widespread among Farmland employees, Elliott stated. Elliott appeared at the hearing on January 28 but did not testify, although he did address the Court with respect to the Retiree Benefits Motion.[10]
The Official Committee of Unsecured Creditors and the Bondholders Committee both supported the termination of benefits as proposed in the Executives Benefits Motion.
Additional facts will be developed as necessary in the following discussion to resolve the issues before the Court.

DISCUSSION
A. The standard for approval of the Motions
The Debtors state that the standard to be employed in ruling on the Motions is similar to the business judgment rule that would apply for the acceptance or rejection of an executory contract under § 365 of the Bankruptcy Code ("Code"), and therefore the business judgment standard should apply. Under the business judgment standard, the question is whether the termination of the retiree benefits is in the Debtors' best economic interests, based on the Debtors' best business judgment in the circumstances. See In re Food Barn Stores, Inc., 107 F.3d 558, 567, fn. 16 (8th Cir.1997); In re Steaks to Go, Inc., 226 B.R. 35, 37 (Bankr.E.D.Mo.1998). This standard is satisfied when a debtor shows that the action to be taken will benefit the estate; it need not show that continued performance would result in an actual loss of value from the estate. In re Audra-John Corporation, 140 B.R. 752, 755-56 (Bankr.D.Minn.1992). "[T]he [Bankruptcy] Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions." In re Johns-Manville Corp., 60 B.R. 612, 615-16 (Bankr.S.D.N.Y.1986).[11]
With respect to the Employment Agreements of the Former Officers, the Court agrees with the Debtors that the business judgment rule applies, because the Court finds that the Employment Agreements are, indeed, executory contracts. However, with respect to the remainder of the Motions, the Court believes that, if § 1114 is applicable to the proposals to terminate the retiree benefits, a balancing of the equities standard would apply. In National Labor Relations Board v. Bildisco & Bildisco, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984), the United States Supreme Court adopted a balancing of the equities test in determining whether a collective bargaining agreement should be rejected pursuant to 11 U.S.C. § 1113. Because of the similarities between §§ 1113 and 1114 (discussed hereinbelow), *914 the Court believes that the balancing of the equities test should be applied to any request to terminate retiree benefits.[12]
B. Application of Section § 1114
A threshold question that must be resolved is whether § 1114 of the Code applies to the Debtors' proposed actions. With the exception of one part of the Executive Life Plan, the Debtors contend that § 1114 does not apply to the Motions. They contend that § 1114 is inapplicable when, as here, the insurance benefit program or plan, by its own terms, allows an employer to modify or terminate the program unilaterally. To the contrary, the objecting Retirees assert that § 1114 is applicable, and that it prohibits the Debtors from terminating their benefits, at least at this juncture.
The resolution of this question is not so easy as it might initially appear. Since its enactment in 1988, § 1114 "has spawned diverse and sometimes inconsistent interpretations and theories as to the substantive and procedural standards necessary for modification of retiree benefits. (footnote omitted) Expressed colloquially, these interpretations are all over the lot." In re Ionosphere Clubs, Inc., 134 B.R. 515, 517 (Bankr.S.D.N.Y.1991) There are very few reported cases in which the courts have sought to divine the intentions of Congress in enacting § 1114; the Court's research has disclosed only one Circuit Court of Appeals decision on the issue. There are no reported Eighth Circuit cases on this issue. What few cases there are are distinctly and almost evenly divided. Some have held that a Chapter 11 debtor must comply with the provisions of § 1114 before it can lawfully modify or terminate the health and welfare benefits of retirees. Others hold that, where the debtor has the pre-bankruptcy right to terminate the benefits, § 1114 does not apply.
In this Court's view, § 1114 prohibits a debtor from terminating or modifying any retiree benefits (as defined in that section) during a Chapter 11 case unless the debtor complies with the procedures and requirements of § 1114, regardless of whether the debtor has a right to unilaterally terminate the benefits.
Section 1114 provides, in relevant part:
(e)(1) Notwithstanding any other provision of this title, the debtor in possession, or the trustee if one has been appointed under the provisions of this chapter (hereinafter in this section "trustee" shall include a debtor in possession), shall timely pay and shall not modify any retiree benefits, except that 
(A) the court, on motion of the trustee or authorized representative, and after notice and a hearing, may order modification of such payments, pursuant to the provisions of subsections (g) and (h) of this section, or
(B) the trustee and the authorized representative of the recipients of those benefits may agree to modification of such payments,
after which such benefits as modified shall continue to be paid by the trustee.
* * * * * *

*915 (f)(1) Subsequent to filing a petition and prior to filing an application seeking modification of the retiree benefits, the trustee shall 
(A) make a proposal to the authorized representative of the retirees, based on the most complete and reliable information available at the time of such proposal, which provides for those necessary modifications in the retiree benefits that are necessary to permit the reorganization of the debtor and assures that all creditors, the debtor and all of the affected parties are treated fairly and equitably; and
(B) provide, subject to subsection (k)(3), the representative of the retirees with such relevant information as is necessary to evaluate the proposal.
(2) During the period beginning on the date of the making of a proposal provided for in paragraph (1), and ending on the date of the hearing provided for in subsection (k)(1), the trustee shall meet, at reasonable times, with the authorized representative to confer in good faith in attempting to reach mutually satisfactory modifications of such retiree benefits.
(g) The court shall enter an order providing for modification in the payment of retiree benefits if the court finds that 
(1) the trustee has, prior to the hearing, made a proposal that fulfills that requirements of subsection (f);
(2) the authorized representative of the retirees has refused to accept such proposal without good cause; and
(3) such modification is necessary to permit the reorganization of the debtor and assures that all creditors, the debtor, and all of the affected parties are treated fairly and equitably, and is clearly favored by the balance of the equities;
11 U.S.C. § 1114(e)(1), (f), and (g)(1)-(3).
Retiree benefits are defined in § 1114(a):
(a) [F]or purposes of this section, the term "retiree benefits" means payments to any entity or person for the purpose of providing or reimbursing payments for retired employees and their spouses and dependents, for medical, surgical, or hospital care benefits, or benefits in the event of sickness, accident, disability, or death under any plan, fund or program (through the purchase of insurance of otherwise) maintained or established in whole or in part by the debtor prior to filing a petition commencing a case under this title.
11 U.S.C. § 1114(a).
Prior to the enactment of § 1114, the Code provided no special protection to the retired, nonunion salaried employees of bankrupt companies. A debtor was generally able, pursuant to § 365 of the Code, to reject contracts that provided welfare benefits to retirees. In re SPECO Corporation, 195 B.R. 674, 677 (Bankr.S.D.Ohio 1996). Retirees whose benefits were terminated would simply have a claim against the debtor for any vested benefits to which they were entitled. Susan J. Stabile, Protecting Retiree Medical Benefits in Bankruptcy: The Scope of Section 1114 of the Bankruptcy Code, 14 Cardozo L.Rev.1911, 1918-19 (1993) (hereinafter "Stabile").[13]
In July 1986, LTV Steel Company and three mining subsidiaries filed a Chapter 11 bankruptcy petition, and shortly thereafter announced that they would cease paying health benefits to approximately 78,000 retirees and their dependents. The affected retirees were both former salaried *916 employees who received benefits under programs terminable at will and former union employees whose benefits were governed by collective bargaining agreements. Congress reacted swiftly. Within days, the Senate passed a bill ordering LTV to reinstate the benefits, and soon thereafter the House passed a bill to protect union retiree benefits by explicitly including them within the protection of § 1113 of the Code. Neither of these bills was finally enacted into law, but Congress did enact stopgap legislation designed to maintain the status quo while it addressed the issues more thoroughly. Finally, in June 1988, it enacted the Retiree Benefits Bankruptcy Protection Act of 1988 ("RBBPA"), which codified § 1114 of the Code. Stabile, at p.1927.
Considered in the light of these historic events, the meaning and purpose of § 1114 seem clear  to require a Chapter 11 debtor to timely pay and not modify any retiree benefits unless the bankruptcy court orders otherwise or the debtor and representatives of the benefit recipients agree to some modification. Nevertheless, courts examining the statute have found it to be ambiguous and, relying on the somewhat ambiguous or at least inconsistent statements of the debating legislators, have held that the statute was not intended to prevent a debtor from terminating retiree benefits if the debtor had a pre-petition right to terminate those benefits. See In re Doskocil Companies Incorporated, 130 B.R. 870 (Bankr.D.Kan.1991); In re North American Royalties, Inc., 276 B.R. 860 (Bankr.E.D.Tenn.2002). The Debtors rely on these cases in arguing that § 1114 does not apply to the pending Motions.
The first place to look for the meaning and purpose of a statute is in the language of the statute itself. Where the statute is clear and unambiguous, there is no need to resort to the legislative history to discern its meaning. "[A]s long as the statutory scheme is coherent and consistent, there generally is no need for a court to inquire beyond the plain language of the statute." United States v. Ron Pair Enterprises, Inc., 489 U.S. 235, 240-41, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989). "Going behind the plain language of a statute in search of a possibly contrary congressional intent is `a step to be taken cautiously' even under the best of circumstances." United States v. Locke, 471 U.S. 84, 105 S.Ct. 1785, 1793, 85 L.Ed.2d 64 (1985) (citations omitted). "The legislative purpose is expressed by the ordinary meaning of the words used." Id."There is a basic difference between filling a gap left by Congress' silence and rewriting rules that Congress has affirmatively and specifically enacted." Id. There is a strong presumption that Congress expresses its intended purpose through the language of the statute. Ardestani v. INS, 502 U.S. 129, 135-36, 112 S.Ct. 515, 520, 116 L.Ed.2d 496, 505 (1991) (quoting Rubin v. United States, 449 U.S. 424, 430, 101 S.Ct. 698, 702, 66 L.Ed.2d 633 (1981)). Where the statute is clear, the court should look to the legislative history only to determine whether there is clearly expressed legislative intention contrary to the language which would require questioning the strong presumption that Congress expresses itself through the language of the statute. Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A., 530 U.S. 1, 6, 120 S.Ct. 1942, 1947, 147 L.Ed.2d 1, 7 (2000).
On its face, the language of the statute is clear. "Notwithstanding any other provision of this title, the debtor in possession, or the trustee . . . shall timely pay and shall not modify any retiree benefits . . . " unless the court approves those modifications pursuant to subsections (g) and (h) of *917 § 1114 or an agreement for modification has been reached with the authorized representative of the recipients of the benefits. 11 U.S.C. § 1114(e)(1) (emphasis added). The prohibition is on the modification of any retiree benefits, and "retiree benefits" are defined broadly in § 1114(a) to encompass payments to any entity or person for the purpose of providing or reimbursing payments for medical, surgical, or hospital care benefits or benefits in the event of sickness, accident, disability, or death under any plan, fund, or program maintained or established by the debtor pre-petition. 11 U.S.C. § 1114(a). "Modification" was surely intended to include termination, inasmuch as termination of benefits would be an even more drastic action than would mere changes in benefits. A modification is "a change in something; an alteration." Black's Law Dictionary, 7th Ed.1999.
There is nothing in the language of the statute to suggest that Congress intended to allow the termination of retiree benefits in those instances where the debtor has the right to unilaterally terminate those benefits under the language of the plan or program at issue. While they assert this right in the pending Motions, the Debtors have not pointed to any language in the statute that would create such an exception. Nor can they, for it does not exist. In fact, if one were to accept the Debtors' argument, the statute would be eviscerated and rendered virtually meaningless. Any debtor  most debtors, more than likely  would be able to point to language in the underlying documents establishing voluntary programs such as the Debtors' giving them the right to unilaterally terminate the programs. With that exception granted, the statute would essentially only apply to collective bargaining agreements or other bargained-for programs, and the legislative history makes it clear that such limitations were not intended. The language of the statute is all-encompassing.
Overall, the legislative history of § 1114 is consistent with the plain language of the statute. Although the RBBPA had its origin in the threat of LTV to cease paying retiree benefits pursuant to the terms of a collective bargaining agreement, the sponsors of the legislation made it clear that the provisions of the RBBPA applied whether or not a collective bargaining agreement is in effect. "This legislation protects retired employees who are covered by a collective bargaining agreement, as well as those where no collective bargaining agreement is in effect." 133 Cong.Rec. 21,099 (statement of Sen. Heflin) (emphasis added). Even more persuasive is this passage from the legislative history:
[The bill] . . . requires a company to continue paying for these [retiree health] benefits even after the termination of a collective bargaining agreement. Only if a company can prove a modification is absolutely necessary and that it treats everyone fairly can a court, after a hearing, order any modification.
Retiree Benefits Security Act of 1987: Hearings on S. 548 Before the Subcomm. on Courts and Administrative Practice of the Senate Comm. on the Judiciary, 100th Cong., 1st Sess. 14 (1987) (statement of Sen. Metzenbaum). See In re Chateaugay Corporation, 945 F.2d 1205, 1212 (2nd Cir.1991) (dissent of Restani, J.).
Additional support for this interpretation of § 1114 may be found in other actions taken by Congress at the same time it approved the RBBPA. For one thing, Congress added paragraph (13) to the plan confirmation standards of § 1129(a) of the Code to require that a plan must provide for the continued funding of retiree benefits at the level set by agreement or by court approval, for the duration of the *918 period the debtor has obligated itself to provide such benefits. 11 U.S.C. § 1129(a)(13).[14] For another, any payment for retiree benefits required to be made before plan confirmation was given administrative expense status under § 503 of the Code. See § 1114(e)(2).[15] Lastly, in § 1114(j), Congress excluded retiree benefits claims from the provisions of § 502(b)(7), which places a limitation on claims for damages resulting from the termination of an employment contract.[16] When these enactments are considered together, it becomes abundantly clear that Congress knowingly acted to provide special protections for retiree benefits when it enacted § 1114.
A consideration of § 1113 of the Code provides further support for the Court's understanding of § 1114. Section 1113 authorizes a court to approve a Chapter 11 debtor's rejection of a collective bargaining agreement only if the court finds that the debtor (or trustee) has submitted the debtor's proposed modifications of the agreement to the authorized representative of the employees covered by the agreement, the authorized representative has refused to accept the proposal, and the balance of the equities favors rejection. 11 U.S.C. § 1113(c). Sections 1113 and 1114 contain virtually identically worded requirements for approval of any proposed modifications  that the modifications are necessary to permit the reorganization of the debtor, and that all creditors, the debtor, and all affected parties are treated fairly and equitably. See § 1113(b) and § 1114(f). In both cases, the debtor must provide the authorized representatives with all relevant information necessary to evaluate the proposal. § 1113(b)(1)(B); § 1114(f)(1)(B). It is clear that § 1113 is designed to provide protections to employees and retirees who are covered by collective bargaining agreements, and that § 1114 is designed to provide protections to those retirees who are covered by other plans, funds, or programs established and maintained by Chapter 11 debtors prior to their filing bankruptcy.
Moreover, Congress doubtlessly recognized that retirees as a class are unique in a bankruptcy proceeding and that they are deserving of special protection. Stabile, at p.1946. As a general rule, retirees are particularly vulnerable when their former employer goes bankrupt, because of their ages, their reduced incomes, and their inability to replace the benefits (medical coverages or life insurance, typically) that are being terminated. Unlike business and trade creditors, retirees are unable to set aside reserves for possible losses or to pass along their losses to other customers. Stabile, at p.1947. In the instant case, there was testimony that some of the retirees made their decisions to retire on the *919 basis of Farmland's promises to continue the life insurance benefits for the rest of their lives, and there was testimony that replacing the life insurance benefits would be inordinately, and perhaps prohibitively, expensive for the retirees. All of these suggest a sound basis and rationale for Congress' according special protections to retirees who are caught up in a Chapter 11 proceeding.[17]
The swiftness with which Congress acted to protect the LTV retirees and their families is also evidence of Congress' intent to provide special protections for retirees. Stabile, at p.1949.
"The clear purpose of the Act [RBBPA] is to give the bankruptcy court power to resolve the competing interests of retirees, debtors and creditors, if agreement as to continuation and level of benefits cannot be reached. The health benefits of retirees are not to be terminated by any action until the bankruptcy court has time to act." Chateaugay, 945 F.2d at 1213 (dissent of Restani, J.) (emphasis added). In summary, § 1114 requires that a Chapter 11 debtor continue to pay all retiree benefits unless either the trustee or debtor in possession and an authorized representative of the retirees agree to a proposed modification or, absent such agreement, the trustee or the debtor in possession convinces the court that a proposed modification is necessary to permit the debtor's reorganization and is equitable.[18]
Based on the foregoing discussion, the Court holds that the provisions of § 1114 are, indeed, applicable to the Debtors' Motions insofar as those Motions seek to modify or terminate the retiree benefits of their former employees, as "retiree benefits" are defined in § 1114(a).
However, Farmland contends that § 1114 is not applicable to the Debtors' termination of benefits under the Deferred Comp Plan, the SERP, the Union Equity Plan, and the Director Deferred Comp Plan, because the benefits provided by those plans are not "retiree benefits" as defined in § 1114(a). The Court agrees. The benefits provided under those Plans are either deferred compensation benefits or benefits based on retirement. They are not payments or reimbursements for medical, surgical, or hospital care, nor are they benefits payable in the event of sickness, accident, disability, or death, as retiree benefits are defined in § 1114(a). Therefore, the Court finds that the Deferred Comp Plan, the SERP, the Union Equity Plan, and the Director Deferred Comp Plan do not fall within the coverage and provisions of § 1114, and that the proposed termination of those Plans should be considered under the business judgment standard. Likewise, the proposed termination of the four former executives' Employment Agreements are outside the provisions of § 1114. All of the other benefit programs and plans encompassed by the Motions are subject to the provisions of § 1114.
C. Appointment of Committee pursuant to § 1114(d)
Having determined that § 1114 applies at least in part to the Debtors' *920 Motions, the Court must now decide whether to appoint a committee of retired employees to serve as the authorized representative for the recipients of the benefits that the Debtors seek to terminate. Several of the objecting Retirees have requested that such a committee be appointed. Section 1114(d), which governs the appointment of a committee, states:
(d) The court, upon a motion by any party in interest, and after notice and a hearing, shall appoint a committee of retired employees if the debtor seeks to modify or not pay the retiree benefits or if the court otherwise determines that it is appropriate, to serve as the authorized representative, under this section, of those persons receiving any retiree benefits not covered by a collective bargaining agreement.
11 U.S.C. § 1114(d).
The Court believes that the statute accords the Court discretion in the appointment of a committee of retired employees, and further determines that it is not appropriate to appoint a committee at this time. Because the Court is denying the Debtors' Motions to terminate the retirees' benefits, no useful purpose would be served by the appointment of a committee. Unless and until Farmland seeks to modify or terminate these plans in accordance with the procedures outlined in § 1114, there is no need for the appointment of a committee. Appointment of a committee at this time would simply delay things further, at considerable expense to the Debtors, and would not change the final result. North American Royalties, 276 B.R. at 868.
Therefore, the Retirees' request for appointment of a committee under § 1114(d) will be denied. However, should the Debtors appeal the Court's decision herein, the Court will appoint a committee so as to assure that the Retirees are adequately represented on appeal.
D. Retiree Benefits Motion
As discussed hereinabove, the Court has determined that § 1114 of the Code applies to the Debtors' proposals to terminate the life insurance benefits provided for their retired employees under a group term life insurance policy with Minnesota Life. The question then is whether the Debtors have complied with the requirements of § 1114 for the termination of such benefits. There is a total lack of evidence to demonstrate such compliance.
Before filing an application to modify any retiree benefits, a debtor must submit the proposed modifications to the authorized representative of the retirees, providing the most complete and reliable information available at the time to show that the modifications are necessary to permit the reorganization of the debtor and assuring that all creditors, the debtor, and all affected parties are treated fairly and equitably. § 1114(f)(1)(A). Additionally, the debtor must provide the retirees' representative with such relevant information as is necessary to evaluate the proposal. § 1114(f)(1)(B). Finally, between the time of making a proposal and the hearing date, the debtor must meet with the retirees' representative and confer in good faith in an attempt to reach mutually satisfactory modifications in the benefits. § 1114(f)(2).
Here, the Debtors have not alleged that they have complied with the dictates of § 1114. In fact, they assert that the requirements of § 1114 are inapplicable. As a result, the Debtors did not ask the Court to appoint a retirees' committee, as required by § 1114(d), and did not submit their proposals to any authorized representative of the Retirees. The Debtors have not presented any evidence directly *921 to the Retirees or any authorized representative to demonstrate why the terminations are necessary or that the retirees are being treated fairly and equitably. Because the Debtors have failed to comply with the requirements of § 1114, the Debtors' Retiree Benefits Motion must be denied.[19] Due to this noncompliance, we do not reach the merits of the Motion.
E. Executive Benefits Motion
1. Director Life Plan, Supplemental Life Plan, Executive Life Plan
Under the Director Life Plan, the Supplemental Life Plan, and the Executive Life Plan, the Debtors have provided varying amounts of life insurance benefits under various arrangements to Farmland's directors and top executives. Because these plans and programs provide benefits in the event of death, they constitute "retiree benefits" within the meaning of § 1114(a) and are therefore governed by the provisions of § 1114 that have been set out above. As with the Retiree Benefits Motion, the Debtors have presented no evidence that they have complied with those requirements, and the Court finds that the Debtors have not, in fact, complied with the requirements of § 1114. Therefore, the Debtors' request to terminate the Director Life Plan, the Supplemental Life Plan, and the Executive Life Plan must be denied at this time.
This does not mean, however, that the Debtors are prohibited from changing the types of life insurance provided so that they could receive the very substantial amount of cash surrender value that has been built up in the present life insurance policies, provided that such changes do not constitute modifications of the Plans under § 1114. Since no evidence was offered on the point, the Court is uncertain whether the Debtors could surrender the present policies and receive the cash surrender value, then replace the policies with term life insurance policies that might be less costly to the Debtors. Or perhaps the life insurance is not necessary at all, but that is a business decision best left to the Debtors. And, as with the other retiree benefits, there is nothing to prohibit the Debtors from terminating these Plans after the Debtors have obtained confirmation of a plan of reorganization.
2. Deferred Comp Plan, SERP, Union Equity Plan, Director Deferred Comp Plan
The Deferred Comp Plan, the SERP, the Union Equity Plan, and the Director Deferred Comp Plan are plans or programs established by the Debtors that provide for the payment of deferred compensation and enhanced retirement benefits. These plans or programs, therefore, are not encompassed within § 1114, and the Debtors need not comply with the requirements of § 1114 in order to terminate these plans or programs. The question is whether the Debtors have exercised sound business judgment in determining that termination of the plans or programs is in the Debtors' best economic interests.
According to the Executive Benefits Motion and the McCoy Affidavit, the Debtors' liabilities to the participants in the Deferred Comp Plan, the SERP, and the Director Deferred Comp Plan are at least $26 million (no amount of liability is stated for the Union Equity Plan). Although it is *922 quite likely that the Executives affected by the termination of these Plans will file general unsecured claims for the amounts they might be owed, it appears to the Court that the Debtors have properly exercised their business judgment in deciding to terminate these Plans. Terminating the Plans should result in the Debtors' being required to pay much less than the $26 million they are presently obligated to pay under the Plans, although the exact amount to be paid will not be determined until a plan of reorganization is approved and all claims have been allowed or disallowed. Further, terminating the Plans will stop the accrual of further liabilities. Therefore, the Court will approve the Debtors' termination of the Deferred Comp Plan, the SERP, the Union Equity Plan, and the Director Deferred Comp Plan.
F. Rejection of Employment Agreements
The final issue to be dealt with is the request by the Debtors that they be permitted to reject the Employment Agreements of four Former Officers who once held some of the top executive offices in Farmland.
Farmland contends the Employment Agreements are executory contracts and can be rejected in these Chapter 11 proceedings pursuant to 11 U.S.C. § 365, which permits a debtor in possession to reject executory contracts, subject to the Court's approval. 11 U.S.C. § 365(a); Steaks to Go, Inc., 226 B.R. at 37. The Bankruptcy Code does not define "executory contract;" however, the Eighth Circuit has defined executory contract as a contract under which the Debtor and other party both are obligated, and that failure of either to complete performance would constitute a material breach excusing the other of performance. Northwest Airlines, Inc. v. Klinger (In re Knutson), 563 F.2d 916, 917 (8th Cir.1977)(quoting V. Countryman, Executory Contracts in Bankruptcy, Part I, 57 Minn.L.Rev. 439, 460 (1973)).
Honse, the former president and chief financial officer of Farmland, contends that his obligations to provide consulting services, cooperate with the Debtors, and refrain from competition and interference do not rise to the level of material future performance, and therefore his Employment Agreement is not an executory contract subject to rejection by the Debtor. Honse relies on In re Spectrum Information Technologies, Inc., 190 B.R. 741 (Bankr.E.D.N.Y.1996), to argue that merely "standing by" and "behaving oneself" are not "material." The court in Spectrum applied the Countryman test and held that the former officers' obligations did not rise to the level of material future performance. The court examined several agreements and found that the obligations of the former officers were merely vestiges of previous agreements. Spectrum, 190 B.R. at 748.
Turning to Honse's obligations in this case, the Employment Agreement provides in pertinent part:
9. Consulting. If Executive qualifies for Severance Benefits under Paragraph 7(a), Executive agrees to make himself available to the Company as needed to consult for a period of one year following termination of employment. Executive shall be available to consult up to an average of forty (40) hours per month. Executive shall be entitled to reasonable compensation for his time in providing such consulting services and to reimbursement of his out of pocket expenses.
*923 (Debtors' Ex. 31)(emphasis added) In addition to consulting services, Section 10 of the Employment Agreement specifies other obligations that Honse agreed to, such as nondisclosure of confidential information, non-interference, non-competition, and cooperation in claims. (Debtors' Ex. 31) Unlike the employment contracts examined by the court in Spectrum, Honse's Employment Agreement contains several obligations which, taken together, rise to the level of material future performance. The Court has no evidence before it to indicate that Honse's obligations were anything other than what is stated in the Employment Agreement. The agreement of a former president and chief financial officer of a major corporation to not disclose confidential information, to not compete with the company, and to assist the company in evaluating claims would seem to be highly pertinent and material obligations, even if the former executive is never asked to do anything else. Honse has not shown that he has been relieved of his contractual obligations. Therefore, the Court finds that material obligations are present on both sides of Honse's Employment Agreement and that the contract is executory.[20]
The Court may approve rejection of an executory contract where the Debtors show that they have complied with the business judgment standard. Food Barn Stores, 107 F.3d at 567, n. 16. In this case, the Employment Agreements are not necessary to the Debtors' post-petition operations and are no longer beneficial to the Debtors. The Former Officers are not likely to provide any meaningful services to the Debtors in these reorganization proceedings. Terminating the Employment Agreements will provide a benefit to the estates, in view of the fact that the Debtors' costs under the contracts exceed $120,000 a month, and $900,000 is still owed to Cleberg on his contract. Therefore, the Court will approve the rejection of the Former Officers' Employment Agreements.
Based on the foregoing discussion, it is, therefore
ORDERED that the Debtors' Motion for Order Authorizing the Termination of Certain Retiree Benefits Under Group Term Life Insurance Policy with Minnesota Life Insurance Company (Document # 1688) be and is hereby DENIED, without prejudice to a later refiling in compliance with 11 U.S.C. § 1114. It is
FURTHER ORDERED that the Debtors' Motion for Order Authorizing (I) the Termination of Certain Executive and Director Benefits and (II) Rejection of Certain Executory Employment Agreements (Document # 1689) be and is hereby GRANTED in part and DENIED in part as follows:
A. The Debtors' request to terminate the benefits under the Farmland Industries, Inc. Executive Deferred Compensation Plan, the Farmland Industries, Inc. Supplemental Executive Retirement Plan, the Union Equity Deferred Compensation Plan, and the Director Deferred Compensation Plan be and is hereby GRANTED.
B. The Debtors' request to terminate the Employment Agreements of Robert W. Honse, John F. Berardi, William Fielding, and H.D. Cleberg be and is hereby GRANTED.

*924 C. The Debtors' request to terminate the Director Life Insurance Plan, the Supplemental Director Life Insurance Plan, and the Executive Split Dollar Life Insurance Plan be and is hereby DENIED, without prejudice to a later refiling in compliance with 11 U.S.C. § 1114.
NOTES
[1] James Rainey, Earl Knauss, Carl Cage, Dave Fulton, Lewis Linville, Jerry Schwab, Charles Wolff, Jack Warren, Harry Platz, Don R. Rogers, James Atwood, and Glen Skold objected to the proposed termination of the Debtors' Executive Split Dollar Life Insurance Plan, which provides life insurance for the objectors.
[2] This Court has jurisdiction of the pending matter pursuant to 28 U.S.C. § § 1334 and 157. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O). This Memorandum Opinion and Order constitutes the Court's findings of fact and conclusions of law pursuant to Rule 7052, Fed.R.Bankr.P., made applicable to these contested Motions by Rule 9014, Fed.R.Bankr.P.
[3] The Court's factual findings are based largely on the Affidavit and the Supplemental Affidavit of Holly D. McCoy, Vice President for Human Resources of Farmland, which were offered in evidence, without objection, by the Debtors in support of the Motions. Also, none of the factual allegations in either of the Motions has been challenged.
[4] There are five Debtors in these jointly administered Chapter 11 proceedings: Farmland Industries, Inc., Farmland Foods, Inc., SFA, Inc., Farmland Pipe Line, Inc., and Farmland Transportation, Inc. Their bankruptcy petitions were filed on May 31, 2002 (the "Petition Date"). They will be referred to herein as "Debtors" or as "Farmland."
[5] The Debtors are not proposing to terminate the life insurance benefits of approximately 120 disabled former employees. The Court previously approved the continuation of those benefits in an Order entered on June 5, 2002, shortly after the Debtors filed their bankruptcy petitions on May 31, 2002. The average amount of coverage for the disabled former employees is about $73,000 a person.
[6] Although there are some 2,200 retired employees affected by the Debtors' proposed termination of the insurance coverage, only four filed formal objections to the Retiree Benefits Motion. One of the objectors, Donald Marsh, is now deceased. (Docket Entry # 2889)
[7] The Court will refer to the benefit plans described above collectively as the "Executive Benefits Plans."
[8] A loss in retirement benefits occurs because retirement benefits are calculated according to the salary paid. If an Executive elected to defer a portion of his or her compensation, retirement benefits would be calculated on the salary actually paid, not on the amount of salary paid plus any deferred amount.
[9] McCoy states in her Affidavit that the Debtors would eliminate approximately $383,000 in annual costs with the termination of the Executive Life Plan, the Director Life Plan, and the Supplemental Life Plan. (McCoy Affidavit, ¶ 35)
[10] The Court received approximately 15 letters and handwritten notes from persons stating that they were retired Farmland employees and objecting to the Debtors' proposal to terminate the life insurance benefits. The letters were scanned and docketed. However, the writers did not appear for the hearings and did not testify; therefore, their letters and notes cannot be considered by the Court.
[11] The Debtors assert that the benefit plans at issue are not executory contracts within the compass of § 365. However, they ask that, if the Court finds that the plans are executory contracts, the Debtors be permitted to reject them pursuant to the business judgment rule. The Court finds that the benefit plans are not executory contracts, so the Debtors' alternative request is rendered moot.
[12] The Supreme Court listed a number of factors that should be examined by a bankruptcy court in determining whether the "balance of the equities" favors rejection of a collective bargaining agreement, and stated that the court "must consider not only the degree of hardship faced by each party, but also any qualitative differences between the types of hardship each must face." Bildisco & Bildisco, 465 U.S. at 526, 104 S.Ct. 1188. Because this Court finds that the Debtors have not complied with the requirements of § 1114 in the first instance, further discussion of the factors to be considered under the balancing of the equities test is unnecessary.
[13] Stabile's article contains an excellent analysis of the history and development of § 1114, as well as informed guidance as to the correct interpretation of the statute.
[14] Section 1129(a) provides:

(a) The court shall confirm a plan only if all of the following requirements are met:
* * * * * *
(13) The plan provides for the continuation after its effective date of payment of all retiree benefits, as that term is defined in section 1114 of this title, at the level established pursuant to subsection (e)(1)(B) or (g) of section 1114 of this title, at any time prior to confirmation of the plan, for the duration of the period the debtor has obligated itself to provide such benefits.
11 U.S.C. § 1129(a)(13).
[15] Section 1114(e)(2) provides:

(2) Any payment for retiree benefits required to be made before a plan confirmed under section 1129 of this title is effective has the status of an allowed administrative expense as provided in section 503 of this title.
11 U.S.C. § 1114(e)(2)
[16] Section 1114(j) states: No claim for retiree benefits shall be limited by section 502(b)(7) of this title. 11 U.S.C. § 1114(j).
[17] The cynic also might suggest that there were more voters among the 78,000 LTV retirees and their families than there are in bankrupt corporations.
[18] The Court's reading of § 1114 finds support in In re SPECO Corporation, 195 B.R. 674 (Bankr.S.D.Ohio 1996), In re Ames Department Stores, Inc., 1992 WL 373492 (S.D.N.Y.1992); and In re New York Trap Rock Corporation, 126 B.R. 19 (Bankr.S.D.N.Y.1991).
[19] Lest the Retirees become too comfortable in the Court's ruling, it should be pointed out that there is nothing to prevent the Debtors from terminating the life insurance program after the confirmation of a plan of reorganization in these Chapter 11 proceedings. See 11 U.S.C. § 1129(a)(13).
[20] Honse was the only Former Officer to object to the rejection of his Employment Agreement on the basis that it was not an executory contract. The Court finds that the remaining agreements are also executory contracts, for the same reasons stated in the body.